EVERSON v. EQUITABLE LIFE ASSUR. SOC. OF THE UNITED STATES.

(Circuit Court of Appeals, Third Circuit. January 10, 1896.)

No. 6.

1. EQUITY JURISDICTION—BILL FOR DISCOVERY AND ACCOUNTING. .

Where a bill seeks both discovery and an accounting, the discovery must be regarded, prima facie, as incidental to the accounting, and, if there is no right to an accounting, the bill will be *held* bad upon demurrer. 68 Fed. 258, affirmed.

2. LIFE INSURANCE—SEMI-TONTINE POLICY—BILL FOR ACCOUNTING.

The relation between the holder of a matured semi-tontine policy and the insurance company is that of debtor and creditor merely, and involves no trust relation; and a policy holder who is dissatisfied with the amount of the surplus which is apportioned to him by the company, pursuant to the terms of the policy, cannot maintain a bill for accounting and discovery when there are no sufficient allegations of fraud. 68 Fed. 258, affirmed.

Appeal from the Circuit Court of the United States for the Western District of Pennsylvania.

This was a suit in equity by T. Bissell Everson against the Equitable Life Assurance Company, praying a discovery and an accounting in respect to the amount due under a matured semi-tontine life insurance policy. A demurrer to the bill was sustained by the circuit court, and the suit was dismissed. See 68 Fed. 258, where the opinion delivered by Buffington, District Judge, and which contains a full statement of the facts, will be found. From this decree complainant appealed. The part of appellant's brief containing the comments upon the opinion below, which are referred to in the opinion of this court, is here given in full.

Watson & McCleave, for appellants.

Remarks upon the opinion of the court below:

"The learned judge recites the provisions upon the back of the policy, constituting the tontine contract, as follows: '(1) That this policy is issued under the semi-tontine plan, the particulars of which are as follows: (2) That the tontine dividend period for this policy shall be completed on the 28th day of May, 1894. (3) That no dividends shall be allowed or paid upon this policy unless the person whose life is hereby assured shall survive the completion of its tontine dividend period as aforesaid, and unless this policy shall then be in force. (4) That all surplus or profits derived from such policies in the semi-tontine plan as shall not be in force at the date of their completion of their respective tontine dividend periods shall be apportioned equitably among such policies as shall complete their tontine dividend period. (5) That upon the completion of the tontine dividend period, on May 28, 1894, provided this policy shall not have been terminated previously by lapse or death, said T. Bissell Everson shall have the option either—First, to withdraw in cash this policy's entire share of the assets, i. e. the accumulated reserve, which shall be $1,231.10, and in addition thereto the surplus apportioned by this society to this policy; secondly,' etc. The court then says (and this is really the ground of the decision): 'That by this contract of insurance the relation created between the parties was that of debtor and creditor is firmly established by numerous authorities.'

"Upon this we observe that the provisions quoted create no contract of insurance, and are entirely separate and distinct from the insurance contract shown upon the face of the policy, yet it is upon these provisions that plaintiff's right in this litigation exclusively rests. It is obvious that these pro-

visions create the tontine, and relate solely and exclusively to the disposition of moneys accumulated out of the annual payments made by a large number of persons in carrying 'such policies on the semi-tontine plan,' after the insurance for which such payments were made has ceased and the insurance contract ended. They relate to the ultimate disposition of overpayments made for insurance and left in the hands of defendant through a period of years. They have nothing to do with the insurance, and only become available after the insurance is at an end. Mr. Everson terminated his insurance on May 28, 1894, and now stands upon the tontine contract expressed in these 'provisions' for the disposition of the overpayments he, together with all others in his class, have made during the last 10 years, in carrying their insurance, and which, throughout the said period, they have left in the hands of the defendant to be accumulated and divided as provided. We may admit that the insurance contract upon the face of the policy creates only the relation of debtor and creditor. By it Mr. Everson owes the company annually $272.50, and upon his death it owes his representatives $10,000. But that contract was terminated by its terms May 28, 1894, and since then exists for no purpose. During the running of it, however, the defendant was permitted, by agreement of plaintiff, to retain in its hands his 'surplus,' or the moneys that he had paid in excess of the cost of his insurance, which is justly his, and, except for his agreement, would have been returned to him annually. He also agreed with defendant and all other holders of such policies, and they with him, that if he died or lapsed during the period, still his surplus should remain with defendant until the end of the period, and be divided among all who have made similar agreements, and who have lived and paid through the period specified. This suit is to ascertain what has become of the plaintiff's surplus or overpayments he has made, which he has left with defendant for 10 years, and the increment thereof by interest earnings and forfeitures of others who have died or failed to pay through.

"Surely this does not involve only the relation of debtor and creditor, but also the duty of the defendant in the accumulation of a fund, and its equitable apportionment thereof at the end of the accumulating period. As was said by Judge Wallace, in Fuller v. Knapp, 24 Fed. 100: 'Upon the case made they were entitled to a portion of the fund, the amount of which necessarily involves an inquiry as to the number and amount of the policies of the class of 1874, the dividends [surplus] which accrued upon them, the number that have been forfeited or have lapsed by retirement or death, the time when they lapsed or became forfeited, and of the interest due upon the investment of the dividends. In the management of this fund the company acts as the agent, in a limited sense, of the policy holders, and owes them the duty of keeping a correct account of the fund. * * * Whether, if discovery were not sought, the bill would be maintainable, it is not necessary to decide. It is sufficient that, being one for discovery as well as for relief, it falls within the class recognized by the authorities as cognizable in equity.' It would seem to be obvious that when Mr. Everson, under the terms of an express agreement made with defendant and with all others making similar agreements with defendant, permitted his surplus payments made to defendant, in carrying his life insurance, to remain with defendant, instead of taking them out annually, as he otherwise would have done, and the defendant, and other holders of such policies agreed that these retained dividends or surplus should be augmented from certain specified sources through a period of years, and then divided equitably among the survivors of the persons permitting them to be so retained, the defendant did, as Judge Wallace held, assume an agency in respect to the management and distribution of the funds so accumulated, and that in respect of such agency it must be held to a duty of accounting. To illustrate: Suppose 100 persons holding shares of stock in a bank make an agreement between themselves and the bank that no one of them would, through a period of 20 years, withdraw from the bank any dividends declared upon such shares, but that the same should remain with the bank throughout the period, to be accumulated at compound interest, and at the end of the period the fund thus accumulated should be divided by the bank exclusively among the survivors of the persons signing the agreement, could

there be any doubt that, when the time for division came, any one of the survivors could file his bill against the bank to compel it to discover the number of shares in the pool, the dividends due to each, the accumulations thereon, and the number and respective interests of the survivors among whom the fund is to be apportioned and methods of apportionment pursued? In such case is not the bank, if not the trustee, yet the agent of the tontine? Yet the case put does not differ one whit in principle from the case at bar. Certainly, there is something else beside the mere relation of debtor and creditor existing between the defendant and the subscribers to the tontine that it has promoted as an adjunct to its business of insurance.

"Again, the learned judge says: 'It would appear, therefore, that upon demurrer to a bill seeking both discovery and relief, it is sufficient to show that the complainant is not entitled to the relief which he prays, and that the addition of a prayer for relief to a bill seeking discovery will render such discovery dependent upon the title to relief.' As we understand this, because the account, which we must have to ascertain the true value of our share in the tontine, is not such an account as equity would take jurisdiction of, alone and of itself, for purpose of relief, the discovery sought, and that is necessary to the statement of the account, will not enable the court to take a jurisdiction which it otherwise would not have. If so, it is contrary to all the authorities. Judge Story, after pointing out that the general jurisdiction of equity in cases of accounting only applies where the accounts are mutual, or there is to be an accounting on both sides, and not where the account is unilateral, lays it down as settled law, from the cases, that equity will take jurisdiction even of a unilateral accounting where discovery is sought and is material to the statement of the account. 1 Story, Eq. Jur. § 459.

"The judge then refers to the magnitude of the accounting required. We surely are not responsible for this. It inheres in the nature of the contract the defendant has made, and the extent of its business in such contracts. In a suit at law we must have precisely the same information, in order to ascertain our true share and the damages to which we are entitled. So the defendant is saved nothing by remitting us to law. And in an action at law the account would be the first step in the testimony to show our loss.

"And, further, it is said in the opinion: 'On the other hand, if such a duty [to account] does not exist,—if the respondent has simply contracted to equitably apportion the surplus and pay the complainant on that basis, and has failed to do so,—its breach of that contract would not impose an obligation to account where none primarily rested, and its broken undertaking must be redressed by another proceeding, and in another tribunal than the present one.' In this the court falls into the error of assuming that the defendant has contracted to pay something out of its own assets, whereas the plaintiff's share is not in the assets of the defendant at all, but it is a sum held in the hands of defendant, and is, in truth and in fact, a liability, and not an asset of defendant. There is no obligation to pay out of its own resources anything. This is obvious from a careful reading of the fourth and fifth 'provisions' above quoted. The fourth is: 'That all surplus or profits derived from such policies on the semi-tontine plan,' etc. 'Derived' by whom? Surely not the company, because we could not speak of the company deriving profits from something it did not own, and these profits are to be derived from policies owned by the holders thereof. The 'surplus or profits' must be 'derived' by the holders of such policies, and be their property. Now, what shall be done with this property of such policy-holders? The 'provision' shows that if such holders shall not keep their policies, if they die or lapse, before the completion of the tontine period, then these surpluses and profits derived by them from their policies while in force —their property left with defendant—shall be equitably apportioned among the survivors of all such holders who have kept their policies through the term. In other words, this property of the policy holders dying or lapsing shall be divided up among those who survive and pay through. Is it not clear that here the creation of a specific fund is provided for, not out of the assets of the defendant, but of the property of other people, left in defendant's hands, intrusted to it, for accumulation and apportionment among

those entitled according to the terms of the contract? The fifth provision is: 'That upon the completion of the tontine dividend period, on May 28, 1894, provided this policy shall not have been terminated previously by lapse or death, said T. Bissell Everson shall have the option either—First, to withdraw in cash this policy's entire share of the assets, i. e. the accumulated reserve, which shall be $1,231.11, and in addition thereto the surplus apportioned by this society to this policy.' What does this mean? 'To withdraw (not that the society shall pay) in cash this policy's entire share of the assets.' What assets? Not assets of the society, but the assets of the class to which the policy belongs, held in the hands of the society. We have already shown that the 'accumulated reserve,' which is to be withdrawn, belongs to the policy creating it, and none others, and this 'provision' recognizes this fact in describing it as a part of 'this policy's entire share of the assets.' Besides this deposit, made by and belonging to this policy, it also has a share in the 'surplus.' This surplus is the retained dividends or profits 'derived' by the policy during 10 years (and which but for the contract of retention, contained in the third 'provision,' would have been paid annually), together with its share of 'all surplus or profits derived from such policies' as were not in force on May 28, 1894,—whose holders have died or lapsed and left their surplus behind for division among the survivors. In neither of these provisions, therefore, is there any undertaking of defendant to pay out of its resources anything. Its whole duty is as to handling and distribution of money belonging to the class of policy holders described. In this proceeding we go for our share of a specific fund belonging to our class under the terms of the contract, and seek nothing from the general resources or assets of the defendant. It is not a personal obligation to pay that we seek to enforce, but an ascertainment of our share in a specific fund which the defendant has undertaken to collect and manage.

"But the court says: 'As was said in a kindred case, there is in reality no specific or separate fund, as it is made up simply by a system of debits and credits contained in the books of the company, which debits and credits are made during the running of the tontine period.' If this is so, the defendant has not kept its contract, as, clearly, the third provision names specific funds to go into the tontine fund for division, and of these they are bound to keep a precise and accurate account. It is of these funds that we seek an accounting, as to their management and apportionment among the parties entitled thereto,—the defendant having no title or interest in them. This accounting is of the most complicated and complex character, and we submit that the grounds upon which the supreme court of Massachusetts and Judge Wallace have rested equity jurisdiction of such accounting are sound and irrefutable, and in agreement with the well-settled principles of such jurisdiction. As said by the Massachusetts supreme court: 'Even if the amounts kept back from the plaintiff, and those of his class of policy holders, by the retention of those dividends which otherwise would have been received, or of those sums accruing from the forfeiture of policies, either in whole or in part, do not constitute a trust fund, or place the defendant in a strictly fiduciary capacity, the defendant was bound to keep accurate accounts of them, and of all interest and profits thereon. All the facts were entirely within its own knowledge, and it is only thus that it can be determined what equitably should be apportioned to the plaintiff. * * * But even if an action at law could be maintained where an account is complicated, so that a full examination and settlement of previous accounts, transactions, or methods of business are necessary, and where the whole matter is entirely within the knowledge of defendant, it cannot so conveniently or accurately be investigated at common law as in equity. * * * A court of equity is the appropriate tribunal for dealing with such an account, and the defendant is fairly bound to produce an account, from the data in its possession, which shall show that it has complied with its promise equitably to apportion to the plaintiff his share in the accumulations made through the operation of the tontine provisions in his policy.' Pierce v. Assurance Soc. (Mass.) 12 N. E. 858."

Willis F. McCook, for appellee.

Before ACHESON and DALLAS, Circuit Judges, and WALES, District Judge.

DALLAS, Circuit Judge. Notwithstanding the thorough and very able argument submitted on behalf of the appellant, we are fully satisfied with the action of the court below, and with the reasoning by which it was supported. The remarks of appellant's counsel in criticism of the opinion of the learned judge have had our attentive consideration, but have failed to convince us that it does not sufficiently maintain his conclusion. Therefore, the decree of the circuit court is, upon the opinion there filed, affirmed.